Filed 4/29/16  Roehrig v. Area 55, Inc. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TOM ROEHRIG, Plaintiff and Appellant, v. AREA 55, INC. et al., Defendants and Respondents. | D066790 (Super. Ct. No. 37-2010-00050074-CU-BT-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Earl H. Maas III, Judge.  Affirmed.

Nicholas & Tomasevic, Craig M. Nicholas and Alex M. Tomasevic, for Plaintiff and Appellant.

The Office of Michael Tenenbaum and Michael Tenenbaum for Defendants and Respondents.

INTRODUCTION

Tom Roehrig, the original named plaintiff in a class action lawsuit alleging a wine aerator was falsely labeled as American made, appeals an order awarding attorney fees

against him for prosecuting the action under the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.)[1] (CLRA) in bad faith. (§ 1780, subd. (e).) Roehrig contends the trial court applied the wrong legal standard and abused its discretion when it determined the defendants were entitled to recover attorney fees. We disagree and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A

Rio Sabadicci invented a red wine aerator produced by Vinturi, Inc. (Vinturi), which is wholly owned by Area 55, Inc., formerly Exica, Inc. (collectively defendants). Sabadicci is the only shareholder and officer of Area 55, Inc.

Vinturi started selling red wine aerators in 2006. Retail stores, wineries and some restaurants and bars carry the product. Performance Engineering Products, a company located in Pomona, California, manufactures the Vinturi body, and has always manufactured the body for products labeled as made in the United States of America (United States). A package contains the Vinturi body with a decorative black silicone band, a rubber stand, and a filter screen. The silicone band, stand, and packaging are made in China and sent to the United States. Thereafter, the band is placed on the Vinturi body, it is placed into the tray, and the box is reclosed.

From 2006 until 2010, the box sold in the United States stated "Vinturi is manufactured in the USA." Vinturi made this representation after Sabadicci reviewed the Federal Trade Commission Web site, which indicated the "Made in the USA" designation

---

[1]     Further statutory references are to the Civil Code unless otherwise indicated.

may be used if the product is all or virtually all made in the USA. Sabadicci concluded it was accurate to represent the Vinturi was made in the United States because the body, which is 95 percent of the product, was made in the United States. Vinturi stopped representing the aerator was made in the United States in February or March, 2010, after this lawsuit was filed. Sabadicci decided to remove the designation after he concluded it was "insane" California law may be different than the laws in other states.

B

Roehrig purchased a Vinturi Essential Wine Aerator for $39.99 on November 30, 2009, at a retail store. Roehrig testified he saw the Vinturi wine aerator at a friend's house and decided to buy it before he went to the store. He testified he also saw a box at a party and learned the Vinturi wine aerator was made in the United States. He went to the store, looked for the Vinturi wine aerator, and purchased it. He did not look at other aerator products to determine if they stated they were made in the United States.

Roehrig never used the product, despite stating he drinks a glass of wine every night. He stated a friend told him the product was not made in the United States and gave him the name of an attorney to contact about the false representation. Roehrig stated he talked to a lawyer because he wanted "to support the California customers." Roehrig did not return the wine aerator to the store for a refund. Instead, he decided to represent the class in this action.

Roehrig initially identified the friend with whom he discussed the Vinturi wine aerator as Sean Rones, a high school friend who was in the business of selling competing wine aerators. Roehrig said the conversation occurred within a few days or a week of the

3

purchase, during the month of November. At another point in the deposition, Roehrig stated his conversation with Rones was before Roehrig purchased the wine aerator. Rones told Roehrig the product was not made in the United States, it was made in China. Rones told him which law firm he should call.

After his deposition, and after the defendants subpoenaed Rones to testify, Roehrig signed an errata sheet deleting all of his deposition references to Rones. Roehrig stated he learned the Vinturi aerator was not made in the United States from "someone." In a subsequent deposition, Roehrig denied having any conversations with Rones and denied knowing Rones was involved in selling wine aerators. He denied having a relationship with Rones other than attending the same high school.

According to Sabadicci, Rones imported and tried to sell a "rip-off" of the Vinturi, which violated the Vinturi patent. Rones was sued for patent infringement in early 2010 and the case settled with Rones and his company agreeing "not [to] manufacture, sell, offer to sell, or import hand-held wine aerators" and to stop selling an infringing product.

When Rones was asked in deposition if he would describe himself as a friend of Roehrig, Rones said "who knows nowadays what a friend [is] and what a friend isn't." He admitted they went to the same high school and had mutual friends, but said he and Roehrig were not friends. Rones was upset Roehrig mentioned his name in deposition.

C

Roehrig filed a putative class action in January 2010 against the defendants asserting consumer fraud claims, including a cause of action under the CLRA.

4

Roehrig moved for class certification in 2011 and for permission to represent the class. In a declaration submitted with the motion, he stated he relied on the representation the product was "Manufactured in the USA" and believed it was entirely made by American workers in the United States. Roehrig stated he would have considered purchasing other similar merchandise if he knew the product was imported or the food-related product was "actually or significantly manufactured in China." He stated he "since discovered that the merchandise that I purchased was actually made outside of the United States." Roehrig contended the representation violated Business and Professions Code section 17533.7.[2] The court granted Roehrig's motion for class certification and concluded Roehrig could adequately represent the class.

The defendants moved to dismiss Roehrig's claim in July 2013 on the basis he had abandoned his claims by filing for bankruptcy in 2010, almost a year before he moved for class certification, and by failing to list the lawsuit in his bankruptcy filings. Roehrig

---

[2]     Business and Professions Code section 17533.7 formerly provided, "It is unlawful for any person, firm, corporation, or association to sell or offer for sale in this State any merchandise on which merchandise or on its container there appears the words 'Made in U.S.A.,' 'Made in America,' 'U.S.A.,' or similar words when the merchandise or any article, unit or part thereof, has been entirely or substantially made, manufactured, or produced outside of the United States."

This statute has since been amended to add subsections limiting the reach of the California statute. Newly enacted subdivision (b) states the section does not apply "to merchandise made, manufactured, or produced in the United States that has one or more articles, units, or parts from outside of the United States, if all of the articles, units, or parts of the merchandise obtained from outside the United States constitute not more than 5 percent of the final wholesale value of the manufactured product." (Bus. & Prof. Code, § 17533.7, subd. (b), as amended by Stats. 2015, ch. 238, § 1, eff. Jan. 1, 2016.)

opposed the motion stating his failure to tell the bankruptcy court about this class action was "inadvertent" and he was "exploring how to fix his error."

Four months later Roehrig apparently had not remedied the error and the court treated the motion to dismiss as a motion for judgment on the pleadings, which it granted with 20 days leave to amend to add a new class representative. Thereafter, a third amended complaint was filed naming another individual as the class representative.[3]

D

After obtaining a judgment of dismissal against Roehrig, defendants sought attorney fees pursuant to section 1780, subdivision (e). The defendants contended they prevailed against Roehrig and Roehrig's prosecution of the CLRA action was not in good faith.

The defendants contended Roehrig's allegation he would not have purchased the product if he knew it was not made in the United States was contradicted by Roehrig's deposition testimony. Roehrig could not identify any other product he decided not to purchase because it or a component part was made outside of the United States. Roehrig owns vehicles manufactured outside of the United States and testified where they were manufactured played no role in his purchase decisions. Roehrig testified his decision to purchase a mobile phone would not have been influenced if he knew component parts were made outside of the United States. He did not care where his clothes were

---

[3]    The register of actions indicates a judgment has subsequently been entered in favor of the defendants against the replacement class representative.

manufactured.  He stated his purchase decisions for other household items (flashlights, vacuum, refrigerator, dishwasher, pots and pans, golf clubs, blender, grill, and computer) would not be impacted if they, or their component parts, were manufactured out of the country.

The defendants also contended Roehrig did not prosecute this case in good faith because he did not own the claim after he filed for bankruptcy and he did not remedy the situation, even after the issue was called to his attention by defense counsel and the court. Additionally, defendants contended Roehrig's inconsistent stories about how he learned about the Vinturi wine aerator, how and when he learned it was not made in the United States, and when he made contact with an attorney was evidence Roehrig did not prosecute the case in good faith.  They pointed to the fact he never used the product and changed his story about Rones's involvement in the purchase and the lawsuit as further evidence of bad faith.  The defendants presented evidence the documents produced by Roehrig in this litigation were authored by Rones prior to Roehrig's deposition.

Roehrig opposed the motion by stating he purchased the product after learning about it from a friend (not Rones) and learning it was made in the United States.  He stated he purchased the product in reliance on the representation it was made in the United States.  He stated he subsequently learned from a conversation with "someone" the product was actually made in China and this person recommended he contact attorneys.

Roehrig's counsel stated his law firm investigated a potential claim against the defendants for falsely representing its products as manufactured in the United States,

"[i]ndependent from Mr. Roehrig's purchase" and, as part of the investigation, obtained documents from Rones.

The court granted the motion for attorney fees concluding the "preponderance of the evidence submitted supports that [Roehrig] acted in both subjective and objective bad faith in filing his lawsuit." The court stated, "Roehrig's actions in 1) buying the product on the recommendation of his friend—who was in active litigation with Defendant at the time, 2) using the same counsel who represented his friend, 3) changing his discovery responses to attempt to eliminate the source and type of referral, and 4) fail[ing] to remedy the bankruptcy abandonment of the claim—even though given ample opportunity to do so by this court[,] give[s] strong support to the argument that Roehrig was interested in buying a lawsuit to make money, or help his friend. There is no reasonable evidence that he bought the product for any other reason. [Roehrig's] arguments to the contrary are not persuasive and the limited evidence provided was not credible." Roehrig appeals the order determining entitlement to fees as an order after judgment. (Code Civ. Proc., § 904.1, subd. (a)(2).)[4]

---

[4]     The respondents' brief indicates additional evidence was submitted to the court regarding the amount of attorney fees sought, but a ruling on the amount to be awarded has been stayed pending this appeal.

DISCUSSION

I

*Legal Standard for Attorney Fees Under the CLRA*

A prevailing plaintiff may recover attorney fees under the CLRA as a matter of right.  In contrast, a prevailing defendant may recover attorney fees under the CLRA only if, "the plaintiff's prosecution of the action was not in good faith."  (Civ. Code, § 1780, subd. (e).)

Roehrig contends we should engraft a two-prong standard applied to other statutes to determine if the prosecution of the action was "not in good faith" for purposes of section 1780:  (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action.  "The determination of the legal basis for an award of attorney fees is a question of law that we review de novo."  (*Corbett v. Hayward Dodge, Inc.* (2004) 119 Cal.App.4th 915, 921 (*Corbett*).)

The court in *Corbett*, *supra*, 119 Cal.App.4th 915 analyzed section 1780's " 'not in good faith' " language and concluded "[c]ourts have uniformly constructed this language as requiring a subjective test."  (*Id.* at p. 924.)  The court rejected the defendant's argument an objective standard should apply.  The court contrasted the attorney fee provision in section 1780 with statutes allowing for attorney fees in "frivolous" actions (Code Civ. Proc., § 128.5 [the court may award attorney fees incurred "as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay"]) or actions brought without "reasonable cause" (Code Civ. Proc., § 1038, subd. (a) [court may award attorney fees as defense costs to a public entity if the action "was not brought

9

in good faith and with reasonable cause"]). In those statutes, courts have held an objective component is required to award attorney fees. (*Corbett*, at pp. 922-924.)

The *Corbett* court observed the "Legislature notably omitted any language in [section 1780] … that indicates attorney fees can be imposed upon a plaintiff prosecuting a CLRA claim solely on a finding that the prosecution was 'frivolous' or without 'reasonable cause.' Rather, the Legislature limited the award to the defendant in [CLRA] actions to a determination that 'the plaintiff's prosecution of the actions was not in good faith.' " (*Corbett*, *supra*, 119 Cal.App.4th at p. 924.) The court observed a subjective test for attorney fees under section 1780, subdivision (d), "comports most closely with the apparent intent of the Legislature" because it encourages prosecutions brought in good faith. In contrast, an objective test considering whether or not reasonable attorneys would agree the claim is meritorious, could chill such lawsuits. (*Ibid*.)

Despite this holding, Roehrig asks us to apply the two-prong standard we apply in considering sanctions under section 3426.4 for "bad faith" prosecution of claims for misappropriation of trade secrets under the Uniform Trade Secrets Act.[5] In *Gemini Aluminum Corp. v. Cal. Custom Shapes* (2002) 95 Cal.App.4th 1249 (*Gemini*), we considered the legislative history for section 3426.4 showed "the Legislature was concerned with curbing 'specious' actions for misappropriation of trade secrets, and such

---

[5] Section 3426.4 provides: "If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party."

actions may superficially appear to have merit." (*Gemini*, *supra*, at p. 1262.) Speciousness, we noted, is defined as " 'apparently right or proper: superficially fair, just or correct but not so in reality… ." [Citation.] Thus, the claim must have been without substance in reality, if not frivolous.' " (*Id.* at p. 1261.) We concluded " 'bad faith' for purposes of section 3426.4 requires objective speciousness of the plaintiff's claim, as opposed to frivolousness, and … subjective bad faith in bringing or maintaining the claim." (*Gemini*, at p. 1262.)

Roehrig has not cited authority indicating the legislative history of the CLRA's section 1780 was intended to deter specious claims. Rather, the plain language of section 1780's fee provision indicates it is intended to encourage plaintiffs to bring actions without the risk of incurring defense attorney fees unless the plaintiff litigates the action in bad faith. We are not persuaded the addition of an objective standard of speciousness is necessary to accomplish this legislative goal.

As the court stated in *Corbett, supra,* 119 Cal.App.4th at page 928, when "a tactic or action utterly lacks merit, a court is entitled to infer the party knew it lacked merit yet pursued the action for some ulterior motive. [Citation.] However, it is within the court's discretion not to draw that inference if convinced the party was acting in the good faith belief the action was meritorious." The converse may also be true. Even if it appears a claim may have some merit initially, it is within the court's discretion to award attorney fees if there is evidence the plaintiff pursued the litigation for an improper purpose in bad faith. (See *id.* at p. 929 [evidence of improper motive may demonstrate an action is pursued in bad faith]; *Gemini*, *supra*, 95 Cal.App.4th at p. 1264 [" 'Bad faith may be

11

inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised' "].)

## II

### *Defendants Were the Prevailing Parties*

Before turning to the issue of applying the legal standard for bad faith, we briefly examine the prevailing party issue. " 'In the absence of legislative direction in the attorney fees statute, the courts have concluded that a rigid definition of prevailing party should not be used. [Citation.] Rather, prevailing party status should be determined by the trial court based on an evaluation of whether a party prevailed " ' "on a practical level," ' " and the trial court's decision should be affirmed on appeal absent an abuse of discretion.' [Citations.] Among the factors the trial court must consider in determining whether a party prevailed is the extent to which each party has realized its litigation objectives." (*Zuehlsdorf v. Simi Valley Unified School Dist.* (2007) 148 Cal.App.4th 249, 257.)

In this case, the court did not abuse its discretion in determining the defendants prevailed in the action as to Roehrig. Roehrig maintains he succeeded in his claim because the defendants voluntarily removed the manufactured in America designation after he filed the lawsuit. However, there was no adjudication on the merits of that claim. Instead, Roehrig continued the litigation, was removed as the class representative, and his case was involuntarily dismissed for failure to remedy the abandonment of his claim in

12

bankruptcy. Therefore, the defendants achieved their litigation objectives of a defense judgment against Roehrig.

III

*Evidence of Bad Faith*

We review the court's decision to grant or deny attorney fees under the legal standard for abuse of discretion. (*Corbett*, *supra*, 119 Cal.App.4th at p. 927.) "Whether the moving party has satisfied the statutory requirements so as to justify a fee award is a question committed to the discretion of the trial court; we review the ruling for abuse of discretion." (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

Even under the abuse of discretion standard, however, there can be a "substantial evidence component" where the court makes factual findings. "We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion." (*Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544; *Bowers v. Bernards* (1984) 150 Cal. App. 3d 870, 873-874 ["the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination"].) We must indulge all reasonable inferences that may be deduced from the facts in support of the party who prevailed below. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633.) "If the evidence gives rise to conflicting inferences, one of which supports the trial court's findings, we must affirm." (*Milton v. Perceptual Dev. Corp.* (1997) 53 Cal.App.4th 861, 867.)

13

There is substantial evidence in this case to support the trial court's factual findings Roehrig prosecuted this action in bad faith. In support of his motion for class certification and request to serve as class representative Roehrig declared he "relied on the representation that the merchandise was made or 'manufactured in the USA,' and paid over $40 (after tax) for this item believing that it was indeed entirely made by American workers right here in the USA. The representation that the product was 'manufactured in the USA' was a significant factor in my purchase decision. Had the merchandise been labeled 'Imported' rather than 'Made in the USA,' or had I been told that this food-related product was actually or significantly manufactured in China, I would have considered purchasing other similar merchandise, especially if that alternative merchandise was actually made in America." (Some capitalization omitted.) Such a statement is required under the CLRA to establish the alleged mislabeling or misrepresentation was an immediate cause of the plaintiff's alleged injury. (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 327, citing *Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 641.)

However, there was substantial evidence Roehrig's statement in support of his class certification motion was not credible and he could not establish he was actually injured due to any alleged mislabeling regarding the country of origin. Roehrig owns numerous consumer goods made in whole or in part outside of the United States. He could point to no other product where he would have decided not to make the purchase if it were not made in the United States.

He testified he had a conversation with Rones about the wine aerator *before* he purchased it. When Roehrig went to the store, he looked for this specific aerator and did not look at the labeling on other similar products. Additionally, Roehrig never actually used the product. Instead, he contacted an attorney, recommended by Rones, and decided to bring this class action lawsuit.[6]

In addition, Roehrig changed his deposition testimony in an attempt to eliminate information about Rones's involvement in the purchase of the aerator and the filing of this lawsuit. He also failed to remedy his bankruptcy abandonment for months after it was brought to his attention.

The evidence is sufficient to establish not only Roehrig's subjective bad faith in prosecuting the action, but also the objective speciousness of the claim when it was brought (were we to apply the standard advanced by Roehrig). The record supports the trial court's finding "Roehrig was interested in buying a lawsuit to make money, or [to] help his friend." The court properly exercised its discretion in granting attorney fees to defendants.

---

[6] The court found Roehrig's contrary arguments and evidence incredible and unpersuasive. We also do not find persuasive Roehrig's challenges to the trial court's recitation of evidence supporting its bad faith finding. The court noted the friend who talked to Roehrig about the wine aerator was in "active litigation with [the] Defendant." Area 55, Inc. filed a patent infringement lawsuit against Rones's company on December 10, 2009, within days of when Roehrig purchased the wine aerator. It is reasonable to infer Rones was aware of Vinturi's position that his competing product infringed on Vinturi's patent before the action was filed. Although Roehrig disputes Rones was represented by Roehrig's attorneys, the law firm admitted it worked with Rones to investigate Vinturi's country of origin representations. It is reasonable to infer Rones referred Roehrig to those attorneys to pursue the false labeling action.

DISPOSITION

The order is affirmed.  The defendants shall recover their costs on appeal.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


HUFFMAN, J.